**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLASSEE DIVISION**

| | |
|---|---|
| LORINE GAINES, as Personal Representative of the Estate and Mother of VINCENT GAINES, | Civil Division |
| Plaintiff,<br><div align="center">v.</div> | |
| JULIE JONES, in her official and individual capacities; KEVIN D. JORDAN, individually; and CORIZON HEALTH, INC. | Case No. 4:18-cv-00367-MW-CAS |
| Defendants. | **JURY TRIAL DEMANDED** |

## <u>FIRST AMENDED COMPLAINT[1]</u>

1.     Plaintiff LORINE GAINES, as Personal Representative of the Estate

and Mother of VINCENT GAINES (Decedent), brings this civil rights, statutory,

and simple negligence action to redress the deprivation, under color of state law, of

rights, privileges, and immunities secured to the Decedent by the Civil Rights Act,

provisions of the Eighth and Fourteenth Amendments to the United States

---

[1] Plaintiff files this First Amended Complaint in response to Defendant Corizon's motion to dismiss pursuant to Fed. R. Civ. P. 15(a)(1)(B).

<div align="center">1</div>

Constitution, the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehabilitation Act").  Mr. Gaines was denied and deprived entirely of adequate nutrition and treatment for his basic and serious mental health and medical needs during a critical period, which resulted in his malnutrition, starvation, and death.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over Plaintiff's civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343, which prescribe the authority of the Federal District Courts to exercise jurisdiction over claims arising under the United States Constitution, laws, or treaties of the United States, and to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States.

3.     Accordingly, this Court has subject matter jurisdiction over Plaintiff's claims under the Eighth and Fourteenth Amendments to the Constitution of the United States and under the Americans with Disabilities Act, 42 U.S.C. § 12102 *et seq.* and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*

4.     Venue is proper in the United States District Court for the Northern District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events

giving rise to the claims occurred within this district, as set forth below.

5.     All conditions precedent to the filing of this action have occurred, been performed, or have been waived.

## **PARTIES**

6.     Plaintiff, Lorine Gaines, is the mother of Decedent, Vincent Gaines, and is an adult resident of Florida.  She is the Personal Representative acting on behalf of the Estate of Vincent Gaines, as well as the survivor of the Decedent as Mr. Gaines' mother.

7.     Defendant Julie Jones is the Secretary of the Florida Department of Corrections ("FDOC"), the state agency that manages correctional facilities in the State of Florida.  FDOC is the third largest state prison system in the country with a budget of $2.4 billion, incarcerating approximately 96,000 prisoners and overseeing nearly 167,000 offenders on active community supervision. From 2012 to 2016,[2]

_____

[2] Corizon's contract with FDOC was subjected to litigation which led to an injunction from December 4, 2012 until June 5, 2013.  The contract resumed on July 1, 2013 until Corizon's early termination of the contract.  *See* Pat Beall, *Corizon's prison health care pullout follows withering report,* Palm Beach Post (Dec. 2, 2015), *available at* https://www.mypalmbeachpost.com/news/crime--law/corizon-prison-health-care-pullout-follows-withering-

FDOC contracted with Defendant Corizon to provide medical and mental health care to all prisoners in FDOC's custody.  At the relevant times hereto, Mr. Gaines, as an incarcerated individual, was under the custody and control of FDOC and had received medical and mental health care from Defendant Corizon.[3]  FDOC receives federal financial assistance and is covered by the Rehabilitation Act.  FDOC is also a public entity within the meaning of Title II of the ADA.  Defendant Jones has ultimate responsibility for the promulgation and implementation of FDOC policies, procedures, and practices and for the management of FDOC.  At all material times hereto, Defendant Jones was an employee or agent of FDOC and was, acting within the scope and course of her employment under color of state law.  Defendant Jones is sued in her official and individual capacities.

8.    Defendant Kevin D. Jordan is an adult resident of the State of Florida, who at all times material hereto worked for FDOC and was charged with implementing, enforcing and following laws, rules, regulations, and policies and providing access to mental health and medical care for prisoners in the custody of

---

report/AZnYZ6DryKaoWzpKsN2hkM/

[3] *See* "About the Florida Department of Corrections", http://www.dc.state.fl.us/about.html (last accessed: Oct. 17, 2018).

FDOC.  At all relevant times, Defendant Jordan was the Warden of Union CI Correctional Institution ("Union CI"), where Mr. Gaines was housed immediately prior to his death, and was responsible for all policies, procedures, and training regarding the mental health and medical treatment of prisoners in Union CI.  At all times relevant hereto, Defendant Jordan acted under color of law and within the scope of employment.  He is sued individually.

9.     Defendant Corizon Health, Inc. ("Corizon") is a Tennessee Corporation registered in the State of Florida that contracted with correctional institutions, including FDOC, to provide medical and mental health care to prisoners.  At all times material hereto, it was acting under color of law and was responsible for the promulgation and enforcement of rules, regulations, policies, and practices regarding the access to and administration of mental health and medical treatment to prisoners in the custody of FDOC.  Corizon was responsible for ensuring that prisoners were not denied mental health and medical treatment and received such treatment in a timely and adequate manner.  Corizon was also responsible for the employment, qualifications, training, supervision, and conduct of its employees and agents. Additionally, Corizon's employees and agents directly oversaw Mr. Gaines' initial mental health and medical intake following his sentencing and remand into the

custody of FDOC, as well as his subsequent treatment and his treatment classifications between various FDOC facilities and within the housing units of each FDOC facility.  Corizon is therefore both directly and vicariously liable under a theory of *respondeat superior* for the actions of its employees, implied agents, agents, and Defendants in this action.

10.     Other Defendants are unknown to Plaintiff at this time; Plaintiff reserves the right to amend this Complaint as soon as the true names and identities of these Defendants have been ascertained.

## FACTUAL ALLEGATIONS

### DEFENDANTS' HISTORY OF MISTREATING MENTALLY ILL PRISONERS

### Alabama

11.     On June 17, 2014, a class of mentally ill and disabled prisoners within the Alabama Department of Corrections ("ADOC") filed a class action lawsuit against Corizon for "ignoring [their] medical and mental health needs and discriminating against prisoners with disabilities."[4]   ADOC had contracted with

---

[4] "Active case: Braggs, et al. Dunn, et al." Southern Poverty Law Center, https://www.splcenter.org/seeking-justice/case-docket/braggs-et-al-v-jefferson-dunn-et-al (last accessed Oct. 16, 2018).

Defendant Corizon to provide medical care to prisoners in its facilities.

12.    The mental health care administered by ADOC through its contract

with Defendant Corizon was found to be "horrendously inadequate…[in]:

> (1) Failing to identify prisoners with serious mental-health needs and to classify their needs properly;

> (2) Failing to provide individualized treatment plans to prisoners with serious mental-health needs;

> (3) Failing to provide psychotherapy by qualified and properly supervised mental-health staff and with adequate frequency and sound confidentiality;

> (4) Providing insufficient out-of-cell time and treatment to those who need residential treatment; and failing to provide hospital-level care to those who need it;

> (5) Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to those who are suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis;

> (6) Imposing disciplinary sanctions on mentally ill prisoners for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health;

> (7) Placing seriously mentally ill prisoners in segregation without extenuating circumstances and for prolonged periods of time; placing prisoners with serious mental-health needs in segregation without adequate consideration of the impact of segregation on mental health; and providing inadequate treatment and monitoring in segregation.

*Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1267-68 (M.D. Ala. 2017).

13.  Defendant Corizon's contract with ADOC was later rescinded in March 2018 when Alabama's Governor signed a new contract with a different medical provider.[5]

## Oregon

14.  On February 11, 2013, while detained at the Lane County Jail in Eugene, Oregon, a suicidal and paranoid schizophrenic prisoner, Kelly Conrad Green II, rammed himself head-first into a cinder block wall.[6]

15.  Believing he was faking the resultant paralysis, Defendant Corizon's medical staff did not conduct a full neurological examination, nor did they call for an EMT.[7]

16.  After Mr. Green lost control of his bowels, a symptom of a spinal injury

---

[5] Mike Cason, *Gov. Kay Ivey signs contract for health care in Alabama prisons,* AL.com (Mar. 19, 2018), https://www.al.com/news/index.ssf/2018/03/gov_kay_ivey_signs_contract_fo.html

[6] Mark Wilson, *Mentally Ill Oregon Prisoner's Wrongful Death Suit Settles for $7.4 Million,* Prison Legal News (Sept. 2016), *available at* https://www.prisonlegalnews.org/news/2016/sep/2/mentally-ill-oregon-prisoners-wrongful-death-suit-settles-74-million/

[7] *Id.*

which Defendant Corizon's staff failed to note in his medical file, jail and Defendant Corizon's staff left him "naked, soiled, and motionless"[8] in a segregation cell instead of cleaning and changing his clothes.

17.     Some six hours after the injury, Defendant Corizon's staff eventually called for an ambulance, but because of the lapse in time, and despite undergoing surgery, Mr. Green became a ventilator-dependent quadriplegic and died 10 months after the injury.[9]

18.     The Lane County Jail terminated its contract with Defendant Corizon in mid-2015.[10]

### Florida

19.     On June 23, 2012, mentally ill prisoner Darren Rainey was locked in a blistering hot shower by FDOC corrections officers at Dade Correctional Institution ("Dade CI") in Miami.[11]

-----------------------

[8] *Id.*

[9] *Id.*; The Associated Press, *Lane County Jail's medical provider settles suit over inmate's wrongful death,* The Oregonian (Aug. 4, 2015), https://www.oregonlive.com/pacific-northwest-news/index.ssf/2015/08/lane_county_jails_medical_prov.html

[10] Mark Wilson, *supra* at n. 6.

[11] Julie K. Brown, *Florida OKs $4.5 million payout for brutal prison shower death*

20.    Mr. Rainey suffered from severe schizophrenia, and this inhumane treatment was devised as a punishment by FDOC guards against prisoners who misbehaved in DCI's mental health unit.[12]

21.    After screaming and begging to be released from the stall for nearly two hours, Mr. Rainey collapsed and died, his skin peeling off his body.[13]

22.    Inexplicably, according to the Inspector General's report released two months later, the cause of Mr. Rainey's death was not determined—it was not until a prisoner whistle-blower, Harold Hempstead, an orderly at Dade CI's Transitional Care Unit, turned to the Miami Herald before the matter was re-investigated.[14]

23.    Mr. Rainey's family filed a civil rights lawsuit, alleging that FDOC "knew about widespread abuse by correctional officers upon inmates with mental illness" and that Corizon "staff employed by Corizon had knowledge of the abuse

---

*of Darren Rainey,* The Miami Herald (Jan. 26, 2018),
https://www.miamiherald.com/news/special-reports/florida-prisons/article196797554.html
[12] *Id.*
[13] *Id.*
[14] Laura Cepero, *Will Lawsuits and Exposés Lead to Reform of Florida's Brutal Prisons?,* Prison Legal News (Feb. 2016), available at
https://www.prisonlegalnews.org/news/2016/feb/2/will-lawsuits-and-exposes-lead-reform-floridas-brutal-prisons/

by correctional officers."[15]

24.    FDOC and Corizon eventually settled the case with Mr. Rainey's family for a total of $4.5 million dollars.[16]

25.    On January 30, 2018, Disability Rights Florida, Florida Legal Services, and private counsel filed a class-action lawsuit seeking injunctive and declaratory against FDOC for violating the Eighth Amendment, ADA, and Rehabilitation Act rights of mentally ill prisoners inside its facilities[17] – which again was facilitated through FDOC's contract with Corizon.

26.    The lawsuit focuses on the inadequate inpatient treatment of mentally ill prisoners at several of FDOC's facilities, including at Union CI.  Notably, the allegations cover the period of time when Mr. Gaines was incarcerated at Union CI, and focuses on FDOC's general lack of treatment for mentally ill prisoners including:  exposure to excessive isolation and segregation; the lack of sufficient qualified clinical staff at inpatient units; inadequate supervision of prisoners on self-

---

[15] *Id.*
[16] Julie K. Brown, *supra* at n. 12.
[17] *Disability Rights Florida, Inc. v. Jones,* No. 3:18-cv-00179 (M.D. Fla. Jan. 30, 2018).

harm observation status ("SHOS");[18] inappropriate treatment settings; and disciplinary punishment for behavior caused by mental illness.

27.    Many of the prisoners referenced in the lawsuit, died as a result of FDOC's failure to oversee appropriate treatment.  Mr. Gaines, similarly, died at Union CI as a consequence of the lack of treatment and care by FDOC and Defendant Corizon.

28.    On February 8, 2018, the District Court approved a settlement agreement between the parties requiring FDOC to correct a myriad of deficiencies in the provision of mental health care for its prisoners.

29.    On or about November 30, 2015, Defendant Corizon announced it would walk away from its contract with FDOC, effectively doing so some time in 2016.[19]

### FDOC AND CORIZON'S SUBSTANDARD TREATMENT OF MENTALLY ILL PRISONERS AT UNION CI AND AWARENESS OF THE INADEQUATE TREATMENT

---

[18] SHOS is a clinical status ordered by the attending clinician that provides for safe housing and close monitoring of patients who are determined to be suicidal or at risk for serious self-injurious behavior, by mental health staff, or in the absence of mental health staff, by medical staff.

[19] *See also* Pat Beall *supra* at n. 2

30. As a result of federal litigation brought by FDOC prisoners due to inadequate medical care and overcrowding,[20] the Florida legislature created the Correctional Medical Authority (CMA).

31. Created in 1986,

> "The CMA's purpose is to assist in the delivery of health care services for inmates in the Department of Corrections (DOC) by advising the Secretary of Corrections of the professional conduct of primary, convalescent, dental, and mental health care and the management of cost consistent with quality care."[21]

32. To achieve its objective, the CMA monitors health care services and conducts independent physical and mental health care surveys at each Florida prison every three years, issuing survey reports of its results.

33. The CMA's survey reports are monitored via Corrective Action Plans ("CAPs") for each facility "until the facilities are in compliance with accepted

---

[20] *See Costello v. Wainwright,* 397 F. Supp. 20 (M.D. Fla. 1975); 430 U.S. 325 (1977) (reversing Fifth Circuit order reversing district court order granting preliminary injunction reducing FDOC prison population due to, *inter alia,* inadequate medical care); Defs'. Rev. Offer of Judgment, *Osterback v. McDonough,* No. 97-cv-2806 (M.D. Fla. 2001) (minimizing potentially harmful effects of Close Management).

[21] "Correctional Medical Authority (CMA)", https://www.flgov.com/correctional-medical-authority-cma/ (last accessed: Oct. 12, 2018).

community standards."[22]

34.     Between 2013 and 2015, at Union CI specifically, the CMA's surveys reflected, and its ensuing CAP assessments determined, that the mental health care services provided at Union CI were not in compliance with accepted community standards.

35.     First, the CMA survey conducted in 2013 indicated that Union CI had considerable staffing shortages—only 14 of 63 nursing positions were filled at the time.

36.     In addition, the survey revealed that "[i]nmates with mental health issues may receive multiple disciplinary reports, sometimes because of difficulty following rules and functioning in the general population, which can result in placement in close management (CM)."

37.     Moreover, the CMA survey indicated that, of the 22 prisoners housed in confinement, general population, and inpatient mental health units at Union CI, nine reported that "ghost trays" were given to some inmates during mealtimes while

---

[22] *Id.*

in confinement or inpatient mental health units.[23]   The report noted that these allegations were documented in an inpatient mental health record.

38.   Furthermore, the same CMA survey documented that the only available cell to be utilized for a prisoner SHOS admission had dried blood on the walls, and other cells had standing water and black mold in them.

39.   As the agency subject to review by the CMA, FDOC was aware of and responsible for the above issues noted in the CMA's survey.

40.   Upon information and belief, as the head of FDOC, Defendant Jones was made personally aware of the issues as reported in the CMA's survey.

41.   Upon information and belief, as the warden of Union CI prior to and during Mr. Gaines' incarceration there, Defendant Jordan was personally aware of the issues reported in the CMA's survey.

42.   The CMA's subsequent 2014 CAP assessments for Union CI found that:

> a.   Union CI remained deficient in post-discharge evaluation

---

[23] The survey defined "ghost trays" as empty Styrofoam containers that should contain a meal.  Appropriately, the CMA's psychiatrist surveyor expressed a concern with this practice, specifically for prisoners taking psychotropic medication, as food and water deprivation can increase the likelihood of seizures.

of prisoners previously under SHOS;

b.   Written referrals mental health staff to mental health staff were not present in the records of prisoners subjected to Union CI's use of force protocol;

c.   In some instances involving the use of force protocol at Union CI, there was no indication that mental health staff interviewed prisoners the next working day to determine the level of mental health care needed going forward;

d.   Prisoners who requested mental health intervention were not seen by mental health staff at Union CI as indicated in the response to the requests;

e.   In some cases, the Individualized Service Plans initiating mental health treatment where not signed by prisoners as required;

f.   In some of Union CI's treatment records, there was no evidence of a behavioral level review or such a review was not reviewed by staff in the appropriate timeframe; and

g.   For prisoners in the Crisis Stabilization Unit, the risk assessment for violence was not present in their treatment records;

43.   Another inspection team's report again informed Defendant Jones about poor medical and mental health care in FDOC facilities. Jones "responded within 72 hours, insisting on more staff, more training, more state oversight, more

specialist appointments"[24], indicating that she was personally aware of the issues with the provision of medical and mental health care by Defendant Corizon.

44.    On April 20, 2016, a CAP assessment conducted jointly by CMA staff and FDOC staff based on Union CI's 2015 records revealed that "of the 67 total items reviewed pertaining to inpatient mental health issues, 47 fell at or below 80 percent compliance, resulting in an overall non-compliance rate of 70 percent."[25]

45.    As the agency subject to review by the CMA, and as a co-surveyor with the CMA on the 2016 report, FDOC was aware of and responsible for the above negative findings enumerating persistent deficiencies in the provision of mental health treatment at Union CI being provided by Defendant Corizon.

46.    In fact, FDOC subsequently conducted its own follow-up audit to the joint assessment, where it found Union CI continually deficient in many of the areas flagged by the previous joint CAP assessments.[26]

_____

[24] *See supra* Pat Beall at n. 2
[25] Union CI CAP Assessment, November 2015 Focused Review of Mental Health Services.
[26] Daniel Lucas, *Audit raises 'grave concerns' about mental health treatment for inmates at central Fla. prison,* Politico (Nov. 4, 2016), https://www.politico.com/states/florida/story/2016/11/prison-audit-raises-grave-concerns-about-mental-health-treatment-for-inmates-107079

47.     As the head of FDOC, Defendant Jones was fully aware of the CMA and FDOC's joint findings in the 2016 CAP assessment and FDOC's conclusions from its follow up audit showing continuing problems at Union CI.

48.     As the contractor for medical services to FDOC at the time, Defendant Corizon was aware of and responsible for the above negative findings enumerating the deficiencies in the provision of mental health treatment at Union CI.

## MR. GAINES' INCARCERATION WITHIN FDOC[27]

49.     On or about June 4, 2013, Mr. Gaines pled guilty in the Fifteenth Judicial Circuit, Palm Beach County, to violation of Fla. Stat. § 810(1)(3) (Burglary of a Dwelling).  He was sentenced to 60 months imprisonment with credit for three hundred and thirty-one (331) days served.  At the sentencing hearing, the Court recommended that Mr. Gaines be housed close to his family in Palm Beach County, and that he be placed in a mental health program.  Mr. Gaines was remanded into the custody of FDOC to begin serving his sentence.

50.     On or about June 24, 2013, Mr. Gaines was received into the custody

---

[27] The following facts were obtained from the custodial and medical records maintained by FDOC and Corizon.

of FDOC at the South Florida Reception Center ("Reception Center"). At the inception of his prison term, he weighed approximately 190 pounds with a height of 5 feet 9 inches, for a Body Mass Index (BMI) of 28.1.  This BMI is considered overweight by the National Institutes of Health.[28]  Under the Custody Assessment and Reclassification System, Mr. Gaines was classified for Close Custody[29] and was assigned to South Bay Correctional Facility ("South Bay").

51.    On or about October 9, 2013, mental health staff at South Bay conducted a biopsychosocial assessment of Mr. Gaines.  Staff noted his history of auditory hallucinations, which had twice led to his being involuntarily held for several months under Florida's Mental Health Act (commonly referred to as the "Baker Act").  In addition, mental health staff at South Bay diagnosed him under the Diagnostic and Statistical Manual of Mental Health Disorders (DSM) as follows:

> AXIS I: 296.44 Bipolar Disorder, mania, with psychotic features
> AXIS II: 317.00 Mild Mental Retardation

---

[28] Indeed, the FDOC Admission Summary for Mr. Gaines described his build as "Stocky."

[29] "Close custody refers to that class of inmates who must be maintained within an armed perimeter or under direct, armed supervision when outside of a secure perimeter."  Fla. Dep't of Corr., *Inmate Orientation Handbook: Reception Center Processing,* available at www.dc.state.fl.us/pub/files/Inmate%20Orientation%20Handbook.pdf.

AXIS III: None
AXIS IV: Incarceration
AXIS V: GAF= 65 (current).

52.　　On or about March 21, 2014, Mr. Gaines was transferred from South Bay to Dade CI with a provisional diagnosis under the DSM for Axis I Bipolar Disorder and Mania and Axis II Borderline Intellectual Functioning.[30]  Prison staff processed the transfer as an emergency referral because Mr. Gaines was exhibiting mood swings, auditory hallucinations, paranoia, disorganized thinking, and was talking to himself.  In addition, he was non-complaint with his medications, only taking them sporadically.  Prison staff also noted that at this time, Mr. Gaines was at risk for exploitation, and staff further noted Mr. Gaines' two prior hospitalizations under the Baker Act for a period of 6 months due to psychosis.  On March 27, 2014, Mr. Gaines was admitted to the Transitional Care Unit at Dade CI with a diagnosis of bipolar disorder and psychosis.

53.　　On or about November 10, 2014, Mr. Gaines continued to experience auditory hallucinations and delusions, and was urinating and defecating on the floor of his cell.  He refused medication and treatment.  According to mental health staff

---

[30] Historically referred to as mental retardation.

20

at the facility, he did not exhibit any suicidal ideations.

54.    On or about November 12, 2014, due to his worsening mental condition, Mr. Gaines was transferred to the Crisis Stabilization Unit of the Reception Center under doctor's orders that he:

      a.  Be placed on suicide watch with checks every 15 minutes;

      b.  Be provided with a suicide mattress, wrap, and blanket;

      c.  Not be permitted any reading materials; and

      d.  Be fed a boneless diet in a Styrofoam tray, without utensils.

55.    Mr. Gaines continued to refuse medication and treatment.  At this time, he reported sleeping only 2 to 3 hours a night.  On November 12, 2014, his weight was recorded by mental health staff as 151 pounds.[31]  He denied having any suicidal ideations to medical staff at the Reception Center.

56.    On or about April 16, 2015, a disciplinary report was prepared against Mr. Gaines for Failure to Follow a Verbal or Written Order after he allegedly became belligerent when being reprimanded by a correctional officer for attempting to enter

---

[31] At that point, since his admission into FDOC custody approximately 16 months earlier, Mr. Gaines had lost 39 pounds.

the food service area without permission.

57.     Sometime after this disciplinary incident, Mr. Gaines was transferred from the Reception Center to Florida State Prison ("FSP"), almost 400 miles away from the Reception Center and over 300 miles away from all of his family, who live in West Palm Beach, Florida.

58.     Shortly thereafter, Mr. Gaines was yet again transferred a short distance to Union CI in Raiford, Florida, which was still hundreds of miles away from his family.

59.     On or about May 15, 2015, as a result of his mental illness and deteriorating mental condition, Mr. Gaines was placed in Close Management status at Union CI.[32]

60.     On or about August 24, 2015, mental health staff at Union CI requested that Mr. Gaines be transferred for inpatient treatment from Union CI's Transitional

---

[32] According to FDOC, "CM refers to the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate through his/her own behavior has demonstrated an inability to live in the general population without abusing the rights and privileges of others."  Fla. Dep't of Corr., "Impact of the 'Rethinking Personal Choice Program: September 2002'" available at http://www.dc.state.fl.us/pub/RPChoice/intro.html.

Care Unit to its Crisis Stabilization Unit.  Staff reported that Mr. Gaines had "been in [the Transitional Care Unit] for a few months and has consistently had difficulty…" and that while he was cooperative with staff and security, he "has been observed smearing feces on his floor."

61.    Nevertheless, on or about September 29, 2015, only a month later, mental health staff at Union CI requested that Mr. Gaines be transferred back to inpatient treatment from Union CI's Crisis Stabilization Unit to the Transitional Care Unit.  At that time, staff indicated that Mr. Gaines no longer demonstrated psychosis or bizarre behavior, and that he "has achieved a level of stability than can be addressed in Transitional Care Unit."

62.    Throughout October 2015, mental health staff noted nothing out the ordinary with Mr. Gaines, and recommended that he be kept at the current treatment level.

63.    On or about November 4, 2015, according to Annette Eccles, a Registered Clinical Social Worker Intern employed by Defendant Corizon who was involved in Mr. Gaines' mental health treatment at Union CI, Mr. Gaines "refused to come out for individual and psychiatry mental health call-outs."

64.    At that time, Bih Tambi, M.D., a psychiatrist employed by Defendant

23

Corizon who was involved in Mr. Gaines' psychiatric and/or medical treatment at Union CI, noted upon review of his laboratory results, that Mr. Gaines' prescription for Tegretol was discontinued due to hyponatremia.[33]  Mr. Gaines was prescribed Tegretol prior to and while in FDOC custody since at least 2013.

65.   On November 24, 2018, Mr. Gaines refused to sign his Individualized Service Plan for treatment.

66.   On or about December 1, 2015, Eccles reported the following of Mr. Gaines:

> "Inmate was alert, standing at cell door looking through the window Inmate's cell was clean and organized; Inmate was alert, calm and cooperative and his speech was appropriate
>
> Appearance: clean, appropriate and neat; Condition of cell was clean"

67.   On or about December 2, 2015, at or around 7:55 AM, Dr. Tambi again noted that Mr. Gaines have been taken off Tegretol for hyponatremia and that he was not on an alternate psychotropic medication to replace the Tegretol.  Dr. Tambi

------

[33] Hyponatremia is a condition that occurs when the level of sodium in the blood is too low.  It is a common side effect of taking Tegretol, which is often prescribed to control acute mania associated with manic depressive disorder, also known as bipolar disorder.  If left uncorrected, hyponatremia can be fatal.

also noted that there were no follow up sodium level results reflected in Mr. Gaines'
records and the records did not mention whether Mr. Gaines was on any medication
to control the hyponatremia.

68.    On or about December 2, 2015, at or around 8:00 AM, a Defendant
Corizon employee and member of Mr. Gaines' Multidisciplinary Services Team
(MDST), "F. Morrison", indicated that Mr. Gaines "declined the opportunity for
recreation activity group" and "[n]o behaviors or appearance of concern are noted at
this time by staff."

69.    Later that morning, at or around 11:00 AM, Erika Biskie, a Senior
Psychologist employed by Defendant Corizon and another member of Mr. Gaines'
MDST, noted that the team had met that morning to "Maintain Current Treatment"
within Union CI's Transitional Care Unit.

70.    At or around 12:30 PM on the afternoon of December 3, 2015,
correctional officers served Mr. Gaines lunch.  When the officers returned to his cell
a short time later, they noticed that Mr. Gaines had not moved and had not eaten any
of his food.  The officers contacted the prison nurse who advised the officers to enter
Mr. Gaines' cell.

71.    At around 1:26 PM, correctional officers entered Mr. Gaines' cell and

found him unresponsive.  Cardiopulmonary resuscitation was started and Mr. Gaines

was transported to Union CI's Urgent Care Center.  Mr. Gaines was not able to be

revived and was pronounced dead at 2:48 PM on December 3, 2015.

72.     On December 4, 2015, an autopsy was performed on Mr. Gaines where

the Medical Examiner made the below findings:

"1.  MALNUTRITION  (HEIGHT  69  INCHES,  WEIGHT  115
POUNDS)[34]

2.     GENERALIZED     UNWASHED     APPEARANCE     AND
PROBABLE FECES ON SOLES OF FEET

3.  CORONARY  ARTERY  ATHEROSCLEROSIS,  MILD  TO
MODERATE

4. HEAVY LUNGS (1865g) WITH MARKED CONGESTION AND
EDEMA

5.  MINOR  SKIN  INJURIES  OF  VARIABLE  AGE  INVOLVING
ANTERIOR AND POSTERIOR TRUNK AND EXTREMITIES

6. KING TL TUBE PLACEMENT IN TRACHEAL LUMEN

---

[34] In the year between his transfer from the SFRC in November 2014 and his
placement at Union CI at the time of his death in December 2015, Mr. Gaines lost
36 pounds; he lost a total of 75 pounds during the approximately two and a half
years he was in the custody of FDOC.  At the time of his death, Mr. Gaines' BMI
was 17.0 – well under the 18.5 minimum considered "underweight" by the
National Institutes of Health.

7. NEGATIVE TOXICOLOGY (SEE UF PATHLABS FORENSIC TOXICOLOGY REPORT Rl 5-02466)

**PROBABLE CAUSE OF DEATH: UNDETERMINED**"

(Emphasis in original autopsy report).  Additionally, the Medical Examiner noted that while the paramedic on scene had attributed the difficulty in using the King L-T tube on Mr. Gaines during resuscitation efforts to trismus,[35] the Examiner indicated that "[i]n my opinion the 'trismus' was actually rigor mortis of jaw muscles in a dead patient."

73.    Following Mr. Gaines' death, Defendants did not timely inform Plaintiff.  As a result, Mr. Gaines was not released to his family; the Decedent was buried by FDOC on FDOC property against the wishes and without the consent of Plaintiff.

**COUNT I**
**VIOLATION OF 42 U.S.C. § 1983 AND THE**
**EIGHTH AMENDMENT TO THE UNITED**
**STATES CONSTITUTION**
**(Against Defendant Jones)**

---

[35] Trismus is the medical name for "lock-jaw", a condition that causes muscles in the jaw to spasm due to various reasons, including neurological conditions, inflammation, or disease.

74.     Defendant Jones is liable personally and in her official capacity as the head of FDOC for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

75.     Jones was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by her employees and agents and that of Defendant Corizon and its employees and agents during the company's tenure as FDOC's mental health and medical services provider.  Despite being so aware, Jones was deliberately indifferent to the FDOC and Corizon policies, customs, and practices that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

76.     Jones was deliberately indifferent when she:

a.      Failed to stop the FDOC policy, custom, or practice of disciplining and punishing FDOC prisoners for behaviors stemming from their mental illness, once she became aware of this policy, custom, or practice as documented in the CMA's CAP assessments;

b.      Failed to stop the FDOC custom or practice of serving mentally ill prisoners "ghost trays" once she became

aware of this custom or practice at FDOC facilities, as documented in the CMA's surveys;

c.      Failed to stop the customs or practices of other retaliatory conduct by FDOC personnel against mentally ill prisoners in FDOC facilities, once she became aware of these customs or practices as documented in the CMA's CAP assessments and media reporting;

d.      Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental health history, including his two prior Baker Act commitments, of which FDOC and Corizon were aware, once she became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

e.      Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness to determine in

which prison and at what level of confinement he should be housed, given the sentencing court's recommendation that he be confined close to his family support in Palm Beach County, Florida, once she became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

f.     Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness culminating in Mr. Gaines being housed in an environment whose squalor and isolation exacerbated his psychotic hallucinations and bipolar disorder, once she became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

g.     Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in not ensuring

that Mr. Gaines was kept clean, clothed, and fed during his incarceration, rather than the unsanitary, disheveled, naked, and starved conditions under which he died, once she became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[36] and its CAP assessments and media reporting on these insufficiencies;

h.   Failed to remedy the policies, practices, or customs of FDOC and Corizon employees resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing 75 pounds in the approximately two and a half years that he was in the custody of FDOC, once she became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[37] and its CAP assessments and media reporting on these

---

[36] Surveys that revealed, among other things, dirty SHOS cells with blood on the walls.

[37] Surveys that revealed, for example, the "ghost tray" custom or practice.

insufficiencies; and

i.    Failed to remedy the policies, practices, or customs of

Corizon to ensure that that the provider adequately treated

mentally ill and malnourished prisoners in FDOC custody,

once she became aware of the policy, practices, and

customs in FDOC facilities through the CMA's surveys[38]

and its CAP assessments and media reporting on these

insufficiencies.

77.    As a direct and proximate cause of Defendant Jones' policy, pattern, practice, and deliberate indifference, Mr. Gaines suffered from harm and violation of his Eighth Amendment rights.

78.    Furthermore, the conduct of all of the Defendant Jones was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiff to punitive damages.

---

[38] Including Corizon's staff adequately monitoring prisoner food intake to stop the "ghost tray" custom or practice by FDOC staff, of which Corizon staff was aware.

32

79.    Plaintiff was obliged to retain counsel in bringing this lawsuit and is entitled to the reasonable value of the attorneys' services, as well as the costs of litigation.

<div align="center">

**COUNT II**
**VIOLATION OF 42 U.S.C. § 1983 AND THE**
**EIGHTH AMENDMENT TO THE UNITED**
**STATES CONSTITUTION**
**(Against Defendant Jordan)**

</div>

80.    Defendant Jordan is liable personally for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

81.    Jordan was personally aware of a history and culture of widespread and longstanding abuse and deliberately indifferent treatment by FDOC's employees and agents, including that of FDOC staff and Corizon employees and agents under his authority at Union CI.  Despite being so aware, Jordan was deliberately indifferent to the FDOC and Corizon policies, customs, and practices at Union CI that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

82.    Defendant Jordan was deliberately indifferent when he:

a.    Failed to stop the policy, custom, or practice of disciplining and punishing prisoners at Union CI for

behaviors stemming from their mental illness, once he became aware of this policy, custom, or practice as documented in the CMA's CAP assessments;

b.   Failed to stop the custom or practice of serving mentally ill prisoners "ghost trays" once he became aware of this custom or practice at Union CI, as documented in the CMA's surveys;

c.   Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in insufficient evaluation of Mr. Gaines' mental health history, including his two prior Baker Act commitments, of which FDOC and Corizon were aware, once he became aware of the policy, practices, and customs at Union CI through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

d.   Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in insufficient evaluation of Mr. Gaines' mental illness

34

culminating in Mr. Gaines being housed in an environment whose squalor and isolation exacerbated his psychotic hallucinations and bipolar disorder, once he became aware of the policy, practices, and customs at Union CI through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

e.     Failed to remedy the policies, practices, or customs of FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines was kept clean, clothed, and fed during his incarceration, rather than the unsanitary, disheveled, naked, and starved conditions under which he died, once he became aware of the policy, practices, and customs at Union CI through the CMA's surveys[39] and its CAP assessments and media reporting on these insufficiencies;

f.     Failed to remedy the policies, practices, or customs of

---

[39] *See supra* at n. 36.

FDOC and Corizon employees at Union CI resulting in not ensuring that Mr. Gaines received adequate nutrition when his mental health disorders prevented him from eating enough food, to the point of losing approximately 39 pounds at Union CI, once he became aware of the policy, practices, and customs at Union CI through the CMA's surveys[40] and its CAP assessments and media reporting on these insufficiencies; and

g.    Failed to remedy the policies, practices, or customs of Corizon at Union CI to ensure that that the provider adequately treated mentally ill and malnourished prisoners in that facility, once he became aware of the policy, practices, and customs at Union CI through the CMA's surveys[41] and its CAP assessments and media reporting on these insufficiencies.

_____

[40] *See supra* at n. 37.
[41] *See supra* at n. 38.

36

83.     As a direct and proximate cause of Defendant Jordan's policy, pattern, practice, and deliberate indifference at Union CI, Mr. Gaines suffered from harm and violation of his Eighth Amendment rights.

84.     Jordan's conduct was of a gross and flagrant character, suggestive of a reckless disregard of human life or safety, and/or a complete lack of care suggesting indifference to consequences, thereby entitling Plaintiff to punitive damages.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1983 AND THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## (Against Defendant Corizon)

85.     Defendant Corizon is both directly and vicariously liable for violating Mr. Gaines' Eighth Amendment right to be free from cruel and unusual punishment.

86.     Corizon, at all times pertinent to this action, contracted with FDOC to provide mental health and medical care and services to prisoners, and as such, the above-mentioned actions and/or omissions of Corizon and/or its agents and employees were committed under color of law and/or pursuant to policies, customs, practices, rules, regulations, ordinances, statutes, and/or usages of Defendant Corizon.

87.     Corizon was aware of a history of widespread and longstanding abuse

37

and deliberately indifferent treatment by its employees, agents, and implied agents which has resulted in many unnecessary and avoidable prisoner deaths and medical injuries during its brief contract with FDOC to provide mental health and medical care.  Despite being so aware, Corizon was deliberately indifferent to the policies, customs, and practices that increased the known risk of serious harm and death in violation of Mr. Gaines' Eighth Amendment rights.

88.   Corizon was deliberately indifferent when its policy makers:

a.   Failed to stop their policy, custom, or practice of understaffing FDOC facilities like Union CI to achieve the necessary number of medical and mental health staff to properly treat mentally ill prisoners, as documented in the CMA's surveys and CAP assessments, and media reporting on FDOC.

b.   Failed to stop their policy, custom, or practice at FDOC facilities of disciplining and punishing prisoners for behaviors stemming from their mental illness, once Corizon became aware of this policy, custom, or practice as documented in the CMA's CAP assessments;

c.   Failed to stop their custom or practice of serving mentally ill prisoners "ghost trays" once they became aware of this custom or practice at FDOC facilities, as documented in the CMA's surveys;

d.   Failed to stop their customs or practices of other retaliatory conduct by FDOC personnel against mentally ill prisoners in FDOC facilities, once Corizon became aware of these customs or practices as documented in the CMA's CAP assessments and media reporting;

e.   Failed to remedy their policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental health history, including his two prior Baker Act commitments, of which FDOC and Corizon were aware, once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

f.   Failed to remedy their policies, practices, or customs of

FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness to recommend to FDOC in which prison and at what level of confinement he should be housed, given the sentencing court's recommendation that he be confined close to his family support in Palm Beach County, Florida, once Corizon became aware of the housing policies, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media reporting on these insufficiencies;

g.      Failed to remedy their policies, practices, or customs of FDOC and Corizon employees resulting in insufficient evaluation of Mr. Gaines' mental illness culminating in Mr. Gaines being housed in an environment whose squalor and isolation exacerbated his psychotic hallucinations and bipolar disorder, once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys and its CAP assessments and media

reporting on these insufficiencies;

h.    Failed to remedy their policies, practices, or customs of
FDOC and Corizon employees resulting in not ensuring
that Mr. Gaines was kept clean, clothed, and fed during his
incarceration, rather than the unsanitary, disheveled,
naked, and starved conditions under which he died, once
Corizon became aware of the policy, practices, and
customs in FDOC facilities through the CMA's surveys[42]
and its CAP assessments and media reporting on these
insufficiencies;

i.    Failed to remedy their policies, practices, or customs of
FDOC and Corizon employees resulting in not ensuring
that Mr. Gaines received adequate nutrition when his
mental health disorders prevented him from eating enough
food, to the point of losing 75 pounds in the approximately
two and a half years that he was in the custody of FDOC,

---

[42] *See supra* at n. 36.

once Corizon became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[43] and its CAP assessments and media reporting on these insufficiencies; and

j.      Failed to remedy their policies, practices, or customs to ensure that that their employees and agents adequately treated mentally ill and malnourished prisoners in FDOC custody, once they became aware of the policy, practices, and customs in FDOC facilities through the CMA's surveys[44] and its CAP assessments and media reporting on these insufficiencies.

k.      Failed to remedy their policies, practices, or customs of Corizon employees resulting in insufficient evaluation of Mr. Gaines' known serious medical needs, including the need to correct his hyponatremia, of which Corizon

---

[43] *See supra* at n. 37.
[44] *See supra* at n. 38.

employees and agents were aware, once Mr. Gaines was

diagnosed with hyponatremia and he was taken off

Tegretol.

89.     As a direct and proximate cause, and moving force, of Defendant

Corizon's policy, pattern, practice, and deliberate indifference, Mr. Gaines suffered

from harm and violation of his Eighth Amendment rights.

90.     Corizon's conduct was of a gross and flagrant character, suggestive of

a reckless disregard of human life or safety, and/or a complete lack of care

suggesting indifference to consequences, thereby entitling Plaintiff to punitive

damages.

**COUNT IV**
**VIOLATIONS OF TITLE II OF THE AMERICANS**
**WITH DISABILITIES ACT AND THE**
**REHABILITATION ACT**
**(Against Defendant Jones)**

91.     Count IV is a claim for disability discrimination against Defendant

Jones in her official capacity as Secretary of FDOC for violating Title II of the

Americans with Disabilities Act ("ADA") (public entities) and Section 504 of the

Rehabilitation Act.

92.     Title II of the ADA prohibits disability-based discrimination by any

43

public entity.  *See* 42 U.S.C. §§ 12131-12132; 28 C.F.R. § 39.130; and 28 C.F.R. §35.130.

93.     Section 504 of the Rehabilitation Act prohibits discrimination against an individual based on disability by any program or entity receiving federal funds. *See* 29 U.S.C. §§ 794(a), (b)(1)(A), (b)(1)(B), and (b)(2)(B).

94.     These disability anti-discrimination laws impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

95.     Mr. Gaines was disabled as defined in 42 U.S.C. § 12102 and 42 U.S.C. §§ 12131, 28 C.F.R. §§ 35.108, as he suffered mental impairments that substantially limited one or more of his major life activities.[45]

96.     FDOC is a program or entity that receives federal financial assistance.

97.     FDOC is a public entity as defined by Title II of the ADA.

98.     FDOC's prison, Union CI Correctional Institution, is a facility and its operation comprises a program of service for purposes of Title II of the ADA.

99.     As a prisoner in FDOC's custody, Mr. Gaines was an individual

---

[45] *See supra* at ¶ 51.

qualified to participate in or receive the benefit of FDOC's services, programs, or activities, including but not limited to out-of-cell activities, visitation, religious services, reading material, and, most importantly, the provision of adequate nutrition and a clean and safe prison environment.

100.   Defendant Jones excluded Mr. Gaines, a mentally ill prisoner housed in FDOC's inpatient mental health units, from participating and benefiting in FDOC's programs, services, and activities, and subjected him to discrimination because of his disability.

101.   Defendant Jones had a practice of allowing prisoners like Mr. Gaines to be disciplined and punished for conduct that was a direct result of their mental illness, which constitutes discrimination against individuals based on their disability in violation of the ADA.

102.   Defendant Jones failed to house Mr. Gaines, a mentally ill prisoner, in the most integrated setting appropriate to his needs; placed Mr. Gaines, a mentally ill prisoner, in inappropriate security classifications; placed Mr. Gaines, a mentally ill prisoner, in facilities that did not offer the same programming as other FDOC facilities; and deprived Mr. Gaines, a prisoner suffering from mental illness, of visitation with family members by placing them in a distant facility, against the

recommendation of the sentencing judge, where Mr. Gaines was not initially, and would not otherwise be housed.

103.   As demonstrated by the CMA's CAP assessments, Defendant Jones knew about the violations noted herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Mr. Gaines as a mentally disabled prisoner in an inpatient unit in FDOC custody.

104.   Had Defendant Jones and her agents, implied agents, and employees not discriminated against Mr. Gaines due to his mental disability, he would not have been disciplined as a result of behavior stemming from his mental illness and he would not have been kept in such insalubrious conditions and in isolation, nor would he have become malnourished to the point of starving to death in the custody of FDOC.

105.   As a direct and proximate cause of this policy, pattern, practice, and deliberate indifference, Mr. Gaines suffered harm and violation of his ADA rights.

## **PRAYER FOR RELIEF**

106.   WHEREFORE, for violation of Mr. Gaines' rights under 42 U.S.C. § 1983 and the Eighth Amendment, Plaintiff demands the following relief against all Defendants:

    i.    Equitable relief against Defendant Jones in her official capacity in the form of the relinquishment of Mr. Gaines' remains to Plaintiff;

    ii.    Judgment in her favor against the individual Defendants and Corizon for their violation of the Eighth and Fourteenth Amendment and 42 U.S.C. § 1983 in an amount to be proven at trial for damages, including, without limitation, pecuniary injury, compensatory damages, and punitive damages;

    iii.    Plaintiff's attorneys' fees, interest and costs under 42 U.S.C. § 1988; and

    iv.    All such other relief as the Court deems just and proper.

107.   WHEREFORE, for violation of Mr. Gaines' rights under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, Plaintiff demands the following relief against Defendant Jones in her capacity as FDOC Secretary:

    i.    Declaratory relief that Defendant Jones violated Mr. Gaines' rights under the Americans with Disabilities Act and Rehabilitation Act;

    ii.    Equitable relief against Jones in the form of the relinquishment of Mr. Gaines' remains to Plaintiff; and

   iii.    Judgment in her favor against Defendant Jones for violating the ADA and Rehabilitation Act in an amount to be proven at trial for damages including, without limitation, pecuniary injury, compensatory damages, and punitive damages;

   iv.    Plaintiff's attorneys' fees, interest and costs; and

   v.    All such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by and through her attorneys, hereby demands a trial by jury on all issues so triable.

Dated: October 19, 2018

                           Respectfully submitted,

                           /s/ Sabarish Neelakanta
                           Sabarish Neelakanta, Fla. Bar No.: 26623
                           sneelakanta@hrdc-law.org
                           Masimba Mutamba, Fla. Bar No.: 102772
                           mmutamba@hrdc-law.org
                           Daniel Marshall, Fla. Bar No.: 617210
                           dmarshall@hrdc-law.org
                           HUMAN RIGHTS DEFENSE CENTER
                           P.O. Box 1151
                           Lake Worth, FL 33460
                           Tel.: (561) 360-2523
                           Fax: (866) 735-7136

                           /s/ Edwin Ferguson

Edwin Ferguson, Fla. Bar. No.: 15216
eferguson@thefergusonfirm.net
THE FERGUSON FIRM, PLLC
41 West 27th Street
Riviera Beach, Florida 33404
Tel.: (561) 840-1846
Fax: (561) 840-1642

*Attorneys for Plaintiff*